Opinion for the court filed by Circuit Judge REYNA.
Dissenting opinion filed by Circuit Judge PLAGER.
*1092 REYNA, Circuit Judge.
Biogen Idee Inc. and Genentech, Inc. (collectively, “Biogen”) seek review of the district court’s construction of the disputed claim term “anti-CD20 antibody” that narrowed the term based on prosecution history disclaimer. Under that construction, Biogen stipulated that it could not prove infringement by GlaxoSmithKline LLC and Glaxo Group Ltd. (collectively, “GSK”). Biogen took that approach in order to appeal the district court’s claim construction. We conclude that the district court did not err in finding a clear and unmistakable disclaimer and, therefore, we affirm.
I. Background
In the mid-1990’s, scientists from Biog-en discovered that patients with Chronic Lymphocytic Leukemia (CLL) could be treated using anti-CD20 antibodies like Biogen’s Rituxan® (rituximab). CLL is a cancer in which a type of white blood cell called a B lymphocyte (“B cell”) becomes cancerous. Normal B cells of CLL patients undergo a malignant transformation, which causes the cells to replicate and accumulate in the bloodstream, bone marrow, and certain tissues at much higher levels than in a healthy person. Symptoms of CLL include fatigue, fevers, bleeding, and infections caused by a decrease in the number of red blood cells and platelets due to the overabundance of B cells in the blood stream. Biogen Idec, Inc. v. Glax-oSmithKline LLC, No. 10-CV-00608, 2011 U.S. Dist. LEXIS 120043, at *2 (S.D.Cal. Oct. 17, 2011). Patients also exhibit signs of the condition including enlarged lymph nodes and spleen from an excess of B cells in the tissue of those organs. Id. As a result, researchers sought a treatment regime that mitigated both the symptoms and signs of CLL by reducing the number cancerous B cells without the deleterious side effects stemming from other treatments such as radiation or chemotherapy.
Fortunately, both normal and cancerous B cells have a portion of the CD20 antigen protein exposed beyond the cell surface. Anti-CD20 antibodies are capable of targeting and binding to these CD20 antigens on the B cell’s surface. Once the anti-CD20 • antibody successfully attaches to the CD20 antigen, it destroys the B cell regardless of whether it is normal or cancerous. For patients with CLL, administering the anti-CD20 antibodies thus mitigates the symptoms and signs caused by the condition while still allowing their bodies to replenish normal B cells.
Biogen sought a patent covering, inter alia, a method for treating patients with CLL involving administering a therapeutically effective amount of the anti-CD20 antibody. It was eventually awarded U.S. Patent No. 7,682,612 (“the '612 patent”), entitled “Treatment of Hematologic Malignancies Associated with Circulating Tumor Cells Using Chimeric Anti-CD20 Antibody.” The patent was not limited to any particular type of anti-CD20 antibody and, in fact, has dependent claims claiming specific types of antibodies: chimeric,[1] rituxi-mab, humanized,[2] and human. In describing its preferred embodiment, the patent explains that
the anti-CD20 antibody will bind CD20 with high affinity, i.e., ranging from 10‘5 to 10"9 M. Preferably, the anti-CD20 antibody will comprise a chimeric, primate, PRIMATIZED®, human, or humanized antibody. Also, the invention embraces *1093 the use of antibody fragments ... and aggregates thereof.
'612 patent col. 2 11. 45-51. But in this regard, the specification acknowledges that “a particularly preferred chimeric anti-CD20 antibody is RITUXAN® (rituxi-mab), which is a chimeric gamma 1 anti-human CD20 antibody.” Id. col. 3 11. 18-20. Additionally, the '612 patent incorporates by reference U.S. Patent No. 5,736,-137 (“the '137 patent”), which teaches the isolation, screening, and characterization of Rituxan®. The '137 patent also defines an “anti-CD20 antibody” as used therein as “an antibody which specifically recognizes a cell surface ... typically designated as the human B lymphocyte restricted differentiation antigen Bp35, commonly referred to as CD20.” '137 patent col. 6 1. 65 to col. 7 1. 2.
At the time of Biogen’s discovery, scientists already knew that available anti-CD20 antibodies could treat certain cancers of the lymph nodes, called B-cell lymphomas, such as non-Hodgkins lymphoma. Unlike CLL, however, lymphomas are characterized by B cells with a greater density of CD20 antigen targets on the surface and fewer cancerous B cells in the bloodstream. Thus, lymphomas were readily treated with anti-CD20 antibodies, but it remained doubtful whether they would be effective against CLL.
Initially, it was believed that only one large loop, or epitope, of the CD20 antigen’s protein chain was exposed on the cancerous B cell’s surface, which made that loop the only suitable target for an anti-CD20 antibody. After Biogen filed its application for the '612 patent, other researchers discovered that the CD20 antigen had a second small loop, to which other anti-CD20 antibodies could attach.
During prosecution of the '612 patent, the examiner rejected all the claims because the specification did not provide en-ablement commensurate with the scope of the claimed invention, which, under the “broadest reasonable interpretation” standard applied by the U.S. Patent and Trademark Office (PTO), included “any and all anti-CD20 antibodies, no matter the specificity or affinity for the specific epitope on the circulating tumor cells.” Joint App’x 307. “[Sjelection of an antibody as an immunotherapeutic agent,” continued the examiner, “is an unpredictable task as the antibody must possess sufficient specificity and a high degree of affinity for its target for use as an immu-notherapeutic agent and because these qualities are dependent on the physiology of the particular pathology and the accessibility of the target antigen.” Id. The examiner acknowledged that the specification was enabling for Rituxan®, but that it was “silent concerning what sort of specificity and affinity would be necessary” for other anti-CD20 antibodies. Id. In response, Biogen pointed to its disclosure of Ritux-an® and maintained that
even though antibodies directed to the same antigen might have different affinities and functional characteristics, one of skill in the art could readily identify an antibody that binds to CD20 with similar affinity and specificity as does RITUX-AN® using techniques that are well known in the art.... With that knowledge in hand, the skilled artisan could readily produce anti-CD20 antibodies using similar techniques, and screen such antibodies for those having an affinity and functional activity similar to RI-TUXAN®.
Joint App’x 324-25. After considering Biogen’s arguments, the examiner withdrew her enablement rejection, and the claims eventually issued.
In 2002, GSK, in collaboration with Gen-mab A/S, developed a breakthrough anti-CD20 antibody, Arzerra® (ofatumumab), *1094 which is distinctly different from Rituxan® in several respects. Whereas Rituxan® attaches to the large loop, it is believed that Arzerra® attaches to the second small loop previously thought to be hidden inside the cell. This means that the Arzerra® anti-CD20 antibody differs from the Ritux-an® anti-CD20 antibody with regard to specificity, or ability of the antibody to bind to a particular epitope of an antigen, and affinity, or tightness of the bond between the antibody and the antigen. Likewise, unlike Rituxan®, which is a chimeric antibody, Arzerra® is a fully human antibody, so there is less of a risk that the body will reject it and develop antibodies against it. Researchers believe that its fully human characteristic permits the antibody to bind to the small loop. Additionally, because Arzerra® binds to the small loop, it has a much greater affinity for the CD20 antigen, which means that it can bind longer, giving the antibody more time to kill the target B cell.
In March 2010, Biogen sued GSK for infringement of the '612 patent, asserting claims 1-4, 6, 8-10, 14-17, 20-22, and 58-60. GSK counterclaimed, alleging nonin-fringement, invalidity, and unenforceability of those claims. The district court held a Markman hearing, and on October 18, 2011, construed the following terms: “effective to treat the chronic lymphocytic leukemia,” “anti-CD20 antibody”/“CD-20 binding fragment,”[3] and “does not include treatment with a radiolabeled anti-CD20 antibody”/“radiation is not used.” For the term, “anti-CD20 antibody,” Biogen proposed the broad construction “an antibody that binds to a cell surface CD20 antigen.” The district court, however, adopted GSK’s construction of “rituximab and antibodies that bind to the same epitope of the CD20 antigen with similar affinity and specificity as rituximab.” Biogen, 2011 U.S. Dist. LEXIS 120043, at *31. It based this conclusion on prosecution history disclaimer wherein Biogen limited that term to overcome the examiner’s enablement rejection. Following this construction, which excluded GSK’s accused Arzerra® product, Biog-en stipulated to noninfringement, and on November 15, 2011, the court entered judgment against Biogen under Federal Rule of Civil Procedure 54(b). Biogen subsequently appealed to this court. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1).
II. Standard of Review
Claim construction is an issue of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 981 (Fed.Cir.1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Accordingly, this court reviews district court claim constructions de novo. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc).
III. Discussion
Claims terms “are generally given their ordinary and customary meaning.” Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir.1996)). But a term’s ordinary meaning must be considered in the context of all the intrinsic evidence, including the claims, specification, and prosecution history. 3M Innovative Props. Co. v. Avery Dennison Corp., 350 F.3d 1365, 1371 (Fed.Cir.2003); see also Phillips, 415 F.3d at 1314. “[T]he prosecution history can often inform the meaning of the claim language by demon *1095 strating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.” Phillips, 415 F.3d at 1317. In the latter circumstance, we have recognized that a “clear and unmistakable” disavowal during prosecution overcomes the “ ‘heavy presumption’ that claim terms carry their full ordinary and customary meaning.” Omega Eng’g, Inc. v. Raytek Corp., 334 F.3d 1314, 1323, 1326 (Fed.Cir.2003); see also Epistar Corp. v. Int’l Trade Comm’n, 566 F.3d 1321, 1334 (Fed. Cir.2009) (“A heavy presumption exists that claim terms carry their full ordinary and customary meaning, unless it can be shown the patentee expressly relinquished claim scope.” (emphasis added)). Thus, when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered. Id. at 1324.
Prosecution history disclaimer plays an important role- in the patent system. It “promotes the public notice function of the intrinsic evidence and protects the public’s reliance on definitive statements made during prosecution.” Id. Such statements can take the form of either amendment or argument. See Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 979 (Fed.Cir.1999); see also Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1374 (Fed.Cir.2008) (“Statements made during prosecution may also affect the scope of the claims.”). For this reason, the entirety of a patent’s file history captures the public record of the paten-tee’s representations concerning the scope and meaning of the claims. Seachange Int’l, Inc. v. C-COR Inc., 413 F.3d 1361, 1372 (Fed.Cir.2005) (quoting Hockerson-Halberstadt, Inc. v. Avia Grp. Int’l, Inc., 222 F.3d 951, 957 (Fed.Cir.2000)); see also Elkay, 192 F.3d at 979 (“[I]t is the totality of the prosecution history that must be assessed, not the individual segments of the presentation made to the [PTO] by the applicant....”). Competitors are entitled to' rely on those representations when determining a course of lawful conduct, such as launching a new product or designing-around á patented invention. Id. Beyond the notice function and reliance-based aspects of a patent’s prosecution history, it “provides evidence of how the [PTO] and the inventor understood the patent.” Edwards Lifesciences LLC v. Cook Inc., 582 F.3d 1322, 1327 (Fed.Cir.2009) (quoting Phillips, 415 F.3d at 1317) (alteration in original).
This case requires us to analyze how the PTO and the inventors understood the disputed term, “anti-CD20 antibody,” in the '612 patent to determine if the inventors disclaimed claim scope during prosecution of that patent. Biogen maintains that all the evidence — including the claims, the specification, and statements made by all parties recorded in the prosecution history — indicates that the term was used according to its plain and ordinary meaning, “an antibody that binds to a cell surface CD20 antigen.” For purposes of our analysis, we initially assume without deciding that neither the claims nor the specification compel a construction contrary to the one offered by Biogen. The question becomes whether statements in the prosecution history are sufficient to overcome the “heavy presumption” that the term carries its full ordinary and customary meaning advanced by Biogen. We conclude that they are.
During prosecution of the '612 patent, the examiner rejected all pending claims because the specification did not enable a person skilled in the art to practice the full scope of the claims, which could have en *1096 compassed “any and all anti-CD20 antibodies, no matter the specificity or affinity for the specific epitope on the circulating tumor cells.” Joint App’x 307. Instead, according to the examiner, the specification only enabled Rituxan®, rituximab, and 2B8-MX-DTPA.[4] It was not enabling for other anti-CD20 antibodies, which had different structural and functional properties.
In response, rather than challenging the examiner’s understanding of the crucial terms, the applicants argued that the specification was enabling for anti-CD20 antibodies with similar affinity and specificity as Rituxan®. Indeed, the applicants conceded that other “antibodies directed to the same antigen [i.e., CD20] might have different affinities and functional characteristics,” and limited their claims to antibodies similar to Rituxan® nonetheless. Joint App’x 324. While the applicants may not have repeated the examiner’s language verbatim et literatim, it is clear that they were limiting their invention to what the examiner believed they enabled: antibodies that have a similar specificity and affinity for the specific epitope to which Ritux-an® binds.[5]
Biogen now argues that because it never explicitly referred to any particular “epitope” — and because CD20 was only thought to have one epitope at the time the patent application was filed — the applicants were merely referring to specificity and affinity in their general sense; that is, anti-CD20’s general preference for B cells regardless of the particular CD20 epitope to which it binds. Read in context, however, the full prosecution history does not support Biogen’s position. The examiner began by characterizing antibodies by their specificity and affinity for a specific epitope, and the applicants adopted that characterization when they limited their claims to antibodies similar to Rituxan®. While disavowing statements must be “so clear as to show reasonable clarity and deliberateness,” Omega, 334 F.3d at 1325, this requirement does not require the applicant to parrot back language used by the examiner when clearly and deliberately responding to a particular grounds for rejection. If an applicant chooses, she can challenge an examiner’s characterization in order to avoid any chance for disclaimer, but the applicants in this case did not directly challenge the examiner’s characterization. See TorPharm Inc. v. Ran-baxy Pharm., Inc., 336 F.3d 1322, 1330 (Fed.Cir.2003) (“Whether the patentee chooses to dispute the examiner’s view of matters is relevant to claim interpretation, for there a court may need to ascertain exactly what subject matter was actually examined and allowed by the PTO.”). Rather, they simply discussed specificity and affinity with regard to the disclosure of the '612 patent, which was narrowly limited to Rituxan®, rituximab, and 2B8-MX-DTPA. The disclaimer of antibodies that do not have a similar affinity and specificity for the specific epitope to which Rituxan® binds was clear and unmistakable. Accordingly, the district court properly limited the scope of the claim term, “anti-CD20 antibody,” based on prosecu *1097 tion history disclaimer.[6]
Biogen makes two arguments regarding why the claim term’s full plain and ordinary meaning should control, both of which are unpersuasive. First, Biogen argues that the claims envisage a difference between claim one’s broad coverage of any and all anti-CD20 antibodies, and the specific types of antibodies listed in the dependent claims — chimeric, rituximab, humanized, and human. See '612 patent col. 8 11. 31-38. Biogen also asserts the general caution against importing a preferred embodiment into the claims. Biogen’s Br. 32. Our cases make clear, however, that where found, prosecution history disclaimer can overcome the presumption of claim differentiation. Regents of Univ. of Cal. v. Dakocytomation Cal., Inc., 517 F.3d 1364, 1375-76 (Fed.Cir.2008). Furthermore, the applicants’ disclaimer in this case is not necessarily inconsistent with other possible embodiments or even the dependent claims, so long as they involve chimeric, humanized, or human antibodies that are similar to Rituxan®. Cf. Elekta Instrument S.A. v. O. U.R. Scientific Int’l, Inc., 214 F.3d 1302, 1308 (Fed.Cir.2000) (adopting a claim construction that excluded the preferred and sole embodiment in light of, inter alia, prosecution history disclaimer).
Second, Biogen contends that because the '612 patent incorporated the '137 patent by reference, the latter patent’s definition of “anti-CD20 antibody” should control. The problem with this argument is that the '137 patent expressly and uniquely defines “anti-CD20 antibody” for use therein, that is, within the '137 patent. '137 patent col. 6 1. 65 (“As used herein, the term ‘anti-CD20 antibody’ is.... ” (emphasis added)). The definition, therefore, does not necessarily reflect how a person of ordinary skill in the art would understand the disputed term in the context of the '612 patent. See Phillips, 415 F.3d at 1313. Rather, it may very well be that this is a “special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.” Id. at 1316. Even assuming the '137 patent conveyed “anti-C20 antibody’s” plain and ordinary meaning, this is a case where prosecution history disclaimer overcomes the presumption of plain and ordinary meaning as we concluded above.
We have considered Biogen’s other arguments, but find no basis for reversing the district court’s claim construction.
TV. Conclusion
For the foregoing reasons, we affirm the district court’s conclusion that “anti-CD20 antibody” as used in the '612 patent is limited by prosecution history disclaimer.
AFFIRMED
*1098 Costs
No costs.

. Chimeric antibodies are antibodies with human and nonhuman (typically rodent) regions.

. Humanized antibodies are antibodies with substantially human regions.

. The claim construction issues concerning "anti-CD20 antibody” and "CD-20 binding fragment” are indistinct; thus, they will be addressed collectively under the term "anti-CD20 antibody.”

. 2B8-MX-DTPA, like Rituxan®, is a chimeric anli-CD20 antibody. See generally '137 patent.

. Pointing to another portion of the prosecution history, Biogen maintains that the novel aspect of the '612 patent is its recognition that any anti-CD20 antibody could treat CLL. Joint App'x 325. This argument, however, does not alter our analysis where the applicants overcame the examiner’s enablement rejection by explicitly relinquishing claim scope. See Computer Docking Station, 519 F.3d at 1377 (“[A] disavowal, if clear and unambiguous, can lie in a single distinction among many.”).

. We are mindful that "it is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims.” Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1124 (Fed.Cir.2004). This case, however, differs markedly from those frequently raising this admonition. Those cases typically involve an applicant standing silent when confronted by statements made by the examiner during prosecution, most often in the examiner’s Statement of Reasons for Allowance. See, e.g., Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1345-47 (Fed.Cir.2005); ACCO Brands, Inc. v. Micro Sec. Devices, Inc., 346 F.3d 1075, 1079 (Fed.Cir.2003). This case deals not only with applicants letting stand an examiner’s narrow characterization of a claim term, but also their adoption of that characterization to overcome the examiner's enablement rejec-' tion. Thus, the acquiescence cases are inap-posite. See TorPharm, 336 F.3d at 1330 (“[T]he public is entitled to equate an inventor’s acquiescence to the examiner’s narrow view of patentable subject matter with abandonment of the rest.”).